## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| VIRIDIANA VILLALOBOS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 6:25-cv-1029 |
| v. | **COMPLAINT – CLASS ACTION** |
| CREDIT UNION OF AMERICA, | **JURY DEMANDED** |
| Defendant. | |

### CLASS ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Viridiana Villalobos ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Credit Union of America ("Defendant"), and alleges as follows:

### INTRODUCTION

1. Plaintiff brings this lawsuit against Defendant on behalf of herself and all others similarly situated on the basis that Defendant has violated the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA"), and Regulation E thereto, 12 C.F.R. § 1005.1, *et seq.* ("Regulation E"), and Defendant has economically harmed Plaintiff and its other customers through the use of deceptive, unclear, and ambiguous language which fails to notify its customers of Defendant's true overdraft fee practices and accordingly fails to provide customers like Plaintiff and the putative class with the ability to plan their finances effectively to avoid these onerous fees.

2. Regulation E requires that, before a financial institution may charge overdraft fees on one-time debit card and ATM transactions, it must obtain the consumer's affirmative consent to participate in the overdraft service. In order to do so, financial institutions must provide customers with a complete, clear, and easily understandable disclosure document that accurately

describes its overdraft services (the opt-in disclosure agreement). The opt-in disclosure document must be substantially similar to Regulation E Model Form A-9 and presented to customers as a stand-alone document not intertwined with other disclosures. The financial institution must then obtain the customer's verifiable agreement to opt-in to the financial institution's overdraft program, regardless of the method of opt-in (i.e., in person at a branch, online, or by phone), only after which may it begin assessing overdraft fees on one-time debit card or ATM transactions.

3.     Defendant's opt-in form did not comply with the EFTA and Regulation E because the form failed to provide a clear and unambiguous description of both the how and when customers can expect to be assessed overdraft fees.

4.     Because Regulation E prohibits banks from charging any overdraft fees on one-time debit card and ATM transactions without first obtaining affirmative consent based on a proper and accurate disclosure of its overdraft practices as presented in a stand-alone opt-in disclosure agreement, Defendant's assessment of overdraft fees on one-time debit card and ATM transactions against consumers who were opted-in has been and continues to be illegal.

## PARTIES

5.     Plaintiff is a citizen of Kansas and resident of Wichita, Sedgwick County, KS. Plaintiff has had a checking account with Defendant at all times relevant hereto.

6.     Defendant Credit Union of America is a credit union with its principal place of business in Wichita, Sedgwick County, KS. It has more than $1.5 billion in assets.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction under 28 U.S.C. § 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act, 15 U.S.C. § 1693, and Regulation E, 12 C.F.R. § 1005 *et seq*.

8.      This Court further has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a State different from the Defendant. The number of members of the proposed Class in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

9.      This Court has personal jurisdiction over the Defendant because Defendant resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District and in Kansas.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters and where Plaintiff conducts banking business with Defendant.

## BACKGROUND FACTS

I.      **Defendant violates the EFTA and Regulation E.**

    A. **Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

11.      The EFTA, 15 USC 1693 *et seq*., is intended to protect individual consumers engaging in electronic fund transfers ("EFTs"). EFT services include transfers through automated teller machines ("ATMs"), point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated and remote banking programs. Prior to December 2011, the Federal Reserve Board was responsible for implementing the EFTA.

12.     The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not decide on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that were almost always quickly repaid. It was a low risk, high reward for the financial institutions, while customers suffered the costly effects.

13.     And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker.

14.     The Federal Reserve also noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

15.     Recognizing that banks and credit unions had strong incentives to adopt these punitive overdraft programs, in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders before the institution could assess overdraft fees ("OD Fees") on ATM and non-recurring "point of sale" debit card transactions. Specifically, Regulation E requires financial institutions to provide

consumers with accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only after a consumer opts-in is the financial institution allowed to assess overdraft fees on these transactions. If a consumer chooses not to opt-in to the financial institution's overdraft service for one-time debit card and ATM transactions, then the financial institution is prohibited from assessing an overdraft fee in connection with any such transaction, regardless of whether payment of the transaction would create an overdraft.

16.     Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of money for a small period of time, then charge a large fee that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest, all with almost no risk as only a very small percentage of the overdraft customers failed to repay the overdraft. Moreover, prior to Regulation E, consumers were often automatically enrolled in these punitive overdraft programs.

17.     In July 2011, rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau ("CFPB") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. The CFPB restated Regulation E at 12 CFR Part 1005 in December 2011.

18.    Like the Federal Reserve, the CFPB recognized that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The CFPB estimated that the banking industry collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."

**B. Regulation E's Opt-in Requirement**

19.    In response to these issues, the Federal Reserve and CFPB promulgated and restated Regulation E, which requires financial institutions like Defendant to obtain informed consent, by way of a written document that, segregated from all other information, fully and accurately describes the financial institution's overdraft services in an easily understandable way. If a member does not opt-in to the financial institution's overdraft program, the financial institution must either cover the overdraft without charging a fee or simply decline payment of the transaction at the point of sale. In either scenario, the institution may not charge a fee against the member's account, because the member has not consented to participate in the overdraft program.

20.    Regulation E also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document "segregated from" other forms, disclosures, or contracts provided by the financial institution. The notice must also accurately disclose to the account holder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1).

6

21.     The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure.

22.     Financial institutions are not permitted to circumvent Regulation E's disclosure requirements by reference to reliance on other account agreements, disclosures, or marketing materials. Rather, Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies that is "segregated from" the other lengthy and convoluted documents that collectively set the terms of members' accounts. 12 C.F.R. § 1005.17(b)(1)(i).

23.     Regulation E provides a private cause of action for a financial institution's failure to abide by its disclosure requirements. Plaintiff thus seeks restitution of improperly charged OD Fees in violation of Regulation E.

24.     Moreover, because Regulation E's requirements are incorporated into the EFTA by way of Section 905(a), 15 U.S.C. § 1693c(a), any violation of Regulation E also violates the EFTA, which is privately enforceable under Section 916, 15 U.S.C. § 1693m.

**C.  Overdraft Calculations**

25.     Financial institutions' fee maximization schemes went beyond these exorbitant penalty fees for the institutions' small advance of funds to cover low-dollar overdrafts. Financial institutions also began manipulating the process as to how they would consider a transaction to be an overdraft to further increase their fee revenue. Specifically, financial institutions charged OD Fees not only when the institution actually advanced money but also when the customer had sufficient funds in their account, and so the financial institutions paid the purported "overdraft"

transactions with the customers' own money. That is, financial institutions like Defendant unilaterally decided the account was overdrawn not based on an actual lack of funds in the account but solely based on a calculation of the account balance that excludes money placed on hold for various reasons, including holds that exceed the amount of the customer's pending transactions.

26. Most banks and credit unions calculate two account balances. First, the "actual balance" reflects the actual amount of money in the customer's account at any particular time. This calculation does not account for holds on pending deposits or funds that have been earmarked for pending transactions. In contrast, the "available balance" represents the actual account balance minus amounts the financial institution has held from pending deposits and/or transactions that have not yet posted (and potentially never will post) to the account.

27. While financial institutions use either the actual balance *or* the available balance to decide whether a transaction overdraws the account, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed in the opt-in form. Thus, when banks and credit unions use the "available balance" to determine whether a transaction is considered an overdraft, that balance calculation method must be disclosed and explained in the opt-in disclosure.

28. Indeed, the difference between the actual balance and the available balance when determining overdrafts is material to both the financial institution and its customers. Because the account's available balance is nearly always lower than the account's actual balance, financial institutions that determine overdrafts based on the available balance instead of actual balance significantly increase the number of transactions that are deemed "overdrafts" and therefore the number of OD Fees they assess.

29. Moreover, because financial institutions like Defendant include the account's actual balance but not the available balance on the customer's period monthly statements, customers are

often unable to understand why they incur OD Fees when Defendant's own account statements show that their accounts always contained sufficient funds to cover their transactions, and so no overdraft occurred.

30.    In fact, in one study, researchers noted that consumers most often discover that OD Fees were levied against their accounts when they receive and review their monthly account statements. *See Overdraft America: Confusion and Concerns about Bank Practices*, PEW TRUSTS 7 (May 2012), https://tinyurl.com/3b4jh5n9.

31.    Studies have further confirmed that "[o]ne of the most salient themes within [consumer] complaints is the difficulty avoiding overdrafts, even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: how OD Fees Harm Consumers and Discourage Responsible Bank Products*, CNTR. FOR RESPONSIBLE LENDING 8 (May 2016), https://bit.ly/3v7SvL1.

32.    Given these issues, financial institutions have been put on notice by regulators and banking associations that failure to fully and accurately notify consumers that overdrafts are based on the available balance calculation rather than the amount of funds actually in their account is an unfair and deceptive practice.

33.    For instance, the Federal Deposit Insurance Corporation ("FDIC") stated in 2019:

> The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.

*Consumer Compliance Supervisory Highlights*, FED. DEPOSIT INS. CORP. 2 (June 2019), https://bit.ly/3t2ybsY. The FDIC recommended that financial institutions mitigate this risk by, *inter alia*, "[p]roviding clear and conspicuous disclosures related to the possible imposition of an overdraft fee in connection with use of the available balance method so that consumers can understand the circumstances under which overdraft fees will be assessed and make informed decisions to avoid the assessment of such fees." *Id*. at 3.

34.    The CFPB also criticized this practice, explaining:

> Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. ***Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive***.

*Supervisory Highlights*, CONS. FIN. PROT. BUREAU 8 (Winter 2015), https://bit.ly/3jVNHY2 (emphasis added).

35.    Put simply, under Regulation E, a financial institution may decide which balance it prefers to use when assessing OD Fees on one-time debit card and ATM transactions; however, Regulation E is also very clear that the financial institution must disclose this practice accurately, clearly, and in a way that is easily understood.

36.    Because the Regulation E opt-in disclosure must include this information in a standalone document that is "segregated from" other disclosures and agreements, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the assessment of OD Fees on one-time debit card and ATM transactions.

37.    Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E and the EFTA.

38.    Indeed, the CFPB and other regulators repeatedly have stated that it is unfair and deceptive to assess overdraft fees on transactions that did not overdraw the actual balance of the account.

**D. Defendant's opt-in form does not accurately explain how or when overdrafts are determined.**

39.    Defendant's opt-in form is attached hereto as Exhibit A.

40.    In direct violation of Regulation E, Defendant's opt-in form does not clearly state when overdraft fees are tabulated or what balance Defendant uses to make the assessment.

41.    Instead, Defendant's opt-in form simply provides broad, unhelpful descriptions that "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *See* Ex. A (emphasis added).

42.    In total the form provides the following insufficient language:

**What You Need to Know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1.  We have standard overdraft practices that are standard when you opt in to Courtesy Pay.
2.  We also offer overdraft protection plans, such as linking to your membership shares account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

➢ **What are the standard overdraft practices if I opt in to Courtesy Pay?**
We do authorize and pay overdrafts for the following types of transactions:
*   Checks and other transactions made using your checking account number
*   Automatic bill payments.
We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
*   ATM Transactions
*   Everyday debit transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction.

If we do not authorize and pay an overdraft, your transaction will be declined.

➢ **What fees will I be charged if Credit Union of America pays my overdraft?**
Under our standard overdraft practices:
*   We will charge you a fee of up to $28 each time we pay an overdraft
*   There is a maximum of 5 overdraft fees per day we can charge you for overdrawing your account.
➢ **What if I want Credit Union of America to authorize and pay overdrafts on my ATM and everyday debit card transactions?**
If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, call 800.256.8049 or visit a branch.
➢ You have the right to revoke your consent at any time for any of these overdraft services, by contacting us at the above contact information.

*Id.*

43.     The above description fails to explain, let alone identify, whether Defendant will make its overdraft determination based on the available balance or the actual balance, which violates Regulations E's requirement that Defendant "[p]rovide[] the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service," 12 C.F.R. § 1005.17(b)(1)(i), as well as Section 905 of the EFTA, which expressly requires that financial institutions like Defendant disclose their terms and

conditions "in accordance with regulations of the [Consumer Financial Protection] Bureau," 15 U.S.C. § 1693c(a).

44.    Defendant's failure to identify and explain its overdraft program prevents consumers from affirmatively consenting (or opting in) to the program. Rather, after reviewing the defendant's opt-in form, consumers are left with no understanding as to how or when Defendant determines overdrafts. Instead, consumers reasonably understand that Defendant will assess OD Fees on transactions only if the account (as demonstrated by the actual balance on their account statements or in their checkbook) does not contain enough money to pay the transaction when they actually will incur OD Fees when there is not enough money in their account's *available* balance, regardless of whether there is actually enough money in their account to cover their transactions.

45.    Defendant's opt-in form thus flouts Regulation E's purpose of "protect[ing] . . . individual consumers engaging in electronic fund transfers," 12 C.F.R. § 1005.1(b), and requiring Defendant to "[p]rovide[] the consumer with a notice in writing, . . . segregated from all other information, describing the institution's overdraft service" and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service." 12 C.F.R. § 1005.17(b)(1)(i)-(ii).

46.    The defendant's opt-in form likewise flouts the EFTA's "primary objective," which is the "provision of individual consumer rights." 15 U.S.C. § 1693(b).

**E. Plaintiff's Experience.**

47.    Defendant charged Plaintiff OD Fees on one-time debit card and ATM transactions on multiple occasions.

48.    For example, Plaintiff was assessed $28 OD Fees on one-time card transactions on May 21, 2024, May 23, 2024, and May 30, 2024.

49.     Because Defendant's opt-in form did not comply with Regulation E or the EFTA, Plaintiff was unable to predict these fees or affirmatively consent (or opt-in) to Defendant's overdraft program. Hence no OD Fee should have been assessed against her account for these one-time debit card and ATM transactions.

## CLASS ACTION ALLEGATIONS

50.     *Description of the Class*: Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff brings this action individually and on behalf of the following Class of persons:

> All consumers who, during the applicable statute of limitations, were checking accountholders of Defendant and were assessed an overdraft fee on a one-time debit card or ATM transaction.

51.     Excluded from the Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

52.     Plaintiff reserves the right to modify or amend the definition of the proposed Class if necessary before this Court determines whether certification is appropriate.

53.     The time period for the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statutes of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

54.     *Numerosity (Fed. R. Civ. P. 23(a)(1))*: The members of the proposed Class are so numerous that individual joinder of all members is impracticable. The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery. Plaintiff estimates the number of members in the Class to be in the thousands.

55.    *Commonality (Fed. R. Civ. P. 23(a)(2)) and Predominance (Fed. R. Civ. P. 23(b)(3))*: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

    a.   Whether Defendant's opt-in form complied with the requirements of Regulation E and the EFTA;

    b.   The proper method or methods by which to measure damages; and

    c.   The declaratory and injunctive relief to which Plaintiff and the Class is entitled.

56.    *Typicality (Fed. R. Civ. P. 23(a)(3)):* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have been similarly affected by Defendant's actions.

57.    *Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))*: Plaintiff will fairly and adequately represent and protect the interests of the Class. There is no hostility of interest between Plaintiff and the unnamed Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex and consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

58.    *Superiority of Class Action (Fed. R. Civ. P. 23(b)(3))*: Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving

the controversies engendered by Defendant's common course of conduct. The class action device allows for unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

59.     *Risk of Inconsistent or Varying Adjudication (Fed. R. Civ. P. 23(b)(1))*: Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

60.     *Action Generally Applicable to Class as a Whole (Fed. R. Civ. P. 23(b)(2))*: Defendant, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

61.     This proposed class action does not present any unique management difficulties.

**CAUSE OF ACTION ONE**
**Violation of Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*., and Regulation E, 12 C.F.R. § 1005 *et seq*.**
**(On Behalf of Plaintiff and the Class)**

62.     Plaintiff incorporates by reference the preceding paragraphs.

63.     By charging overdraft fees on ATM and nonrecurring debit card transactions, Defendant violates Regulation E, 12 C.F.R. § 1005, *et seq*., the "primary objective" of which is

"the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*." 12 C.F.R. § 1005.1(b)).

64.    Specifically, the fees violate what is known as the "Opt-In Rule" of Regulation E. 12 C.F.R. § 1005.17. The Opt-In Rule states: "a financial institution . . . shall not assess a fee or charge . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. *Id*.

65.    To comply with the notice requirement, the notice "shall be clear and readily understandable," 12 C.F.R. § 1005.4(a)(1), and "segregated from all other information, describing the institution's overdraft service," 12 C.F.R. § 1005.17(b)(1)(i). To assist in preparing such notice, Regulation E identifies the specific information that must be included in the opt-in notice and notes that no other information may be included. 12 C.F.R. § 1005.17(d). Regulation E also provides an exemplar opt-in notice as Model Form A-9 and expressly requires that any opt-in notice utilized by Defendant "shall be substantially similar to Model Form A-9 set forth in appendix A of this part." *Id*.

66.    To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in and must provide a reasonable opportunity for the customer to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

17

67.     The intent and purpose of this opt-in disclosure is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948.  This commentary is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z).

68.     Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a "clear and readily understandable" description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Specifically, Defendant's opt-in form fails to satisfy 12 C.F.R. § 1005.17 because it fails to state when or how an OD Fee will be assessed or that an OD Fee may be assessed when, according to Defendant's own records, show there was enough money in the customer's account to cover the transaction that purportedly overdrew the account. Defendant failed to use language to describe the overdraft service that identified that it was using available balance to assess overdraft fees, which meant there was money in the account to cover Plaintiff's transaction, and Defendant did not have to advance any money – yet Defendant assessed OD Fees anyway.

69.     Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions.

70.    The "primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

71.    Section 904 of the EFTA states that the CFPB "shall prescribe rules to carry out the purposes of this subchapter." 15 U.S.C. § 1693b(a)(1). The CFPB has prescribed such rules in the form of Regulation E, 12 C.F.R. § 1005, *et seq.*

72.    The EFTA's grant of authority to the CFPB includes the authority to issue model clauses "to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b). The CFPB issued a model form as Model Form A-9.

73.    Section 905 of the EFTA requires that "the terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed . . . . in accordance with regulations of the Bureau." 15 U.S.C. § 1693c(a). Such "terms and disclosures" "shall be in readily understandable language" and include information regarding "any charge for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4).

74.    Accordingly, in failing to use a Regulation E-compliant opt-in form, Defendant violated Section 905 of the EFTA by failing to make disclosures "in accordance with regulations of the Bureau."

75.    Plaintiff and members of the Class have been harmed by Defendant's practice of assessing OD Fees on one-time debit card and ATM transactions when, under Regulation E and the EFTA, Defendant did not have authority to do so.

76.    As the result of Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, *et seq.*, and the EFTA, 15 U.S.C. § 1693c, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a.  Certify this case as a class action pursuant to Fed. R. Civ. P. 23(a)(2) and (b)(3), designating Plaintiff as class representative and the undersigned as Class Counsel;

b.  Award Plaintiff and the Class actual damages in an amount according to proof;

c.  Award Plaintiff and the Class restitution in an amount to be proven at trial;

d.  Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

e.  Award Plaintiff and the Class attorneys' fees and costs as permitted by the EFTA;

f.  Declare Defendant's practices outlined herein to be unlawful to the extent they are inconsistent with Defendant's own representations;

g.  Enjoin Defendant from continuing to misrepresent its overdraft practices;

h.  Grant Plaintiff and the Class a trial by jury;

i.  Grant leave to amend these pleadings to conform to evidence produced at trial; and

j.  Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

*/s/ Richard S. Fisk*
Richard S. Fisk, KS # 23712
BEAM-WARD, KRUSE, WILSON & FLETES, LLC
8645 College Boulevard, Suite 250
Overland Park, Kansas 66210
T: (913) 339-6888

F: (913) 339-9653
rfisk@bkwflaw.com

Lynn A. Toops*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-636-6481
Facsimile: 317-636-2593
ltoops@cohenmalad.com

*Attorneys for Plaintiff and the Putative Class*

* to seek admission *pro hac vice*