IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

VIRIDIANA VILLALOBOS, *individually and
on behalf of all others similarly situated*,

        Plaintiff,

v.                                                                                                  Case No. 25-1029-JWB

CREDIT UNION OF AMERICA,

        Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's motion to dismiss. (Doc. 13.) The motion is fully briefed and ripe for decision. (Docs. 14, 16, 22.) The motion is DENIED for the reasons stated herein.

**I.    Facts**

The following facts are taken from Plaintiff's complaint. (Doc. 1.) Viridiana Villalobos ("Plaintiff") filed this putative class action against Credit Union of America ("CUA" or "Defendant"). Plaintiff alleges violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693, *et seq*., and Regulation E therein, 12 C.F.R. § 1005.1, *et seq*. ("Regulation E").

The underlying dispute involves overdraft fees. An "overdraft" is a banking term that describes a deficit in a bank account caused by drawing more money than is in the account. Financial institutions historically provide overdraft coverage. *See* Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009). But such coverage comes at an understandable cost:

1

overdraft fees. In response, the Federal Reserve Board[1] revised Regulation E, in 2009, by adding a provision that was intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit [those] overdraft costs." *Id*. Those revisions, among other things, required financial institutions to secure consumers' "affirmative consent" before assessing overdraft fees on ATM and non-recurring point-of-sale debit card transactions. *Id*. at 59,036. They further mandated that institutions provide consumers with accurate disclosures in understandable language by way of an opt-in notice. *Id*. The opt-in notice was to be a stand-alone disclosure, segregated from all other information, with the accountholder's choices presented in a "clear and readily understandable manner." 12 C.F.R. § 1005.17(b)(1)(i). Further, the opt-in notice was to be "substantially similar" to a model form promulgated by the Federal Reserve Board ("Model Form A-9"). *Id*. § 1005.17(d).

Model Form A-9 has subsequently become the culprit of confusion and widespread litigation. *See Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1235 (11th Cir. 2019); *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 6 (D.D.C. 2016). This is because Model Form A-9 fails to specify which calculation method for an account balance ought to be used by a financial institution when determining whether a transaction results in an overdraft. 12 C.F.R. § pt. 1005, app. A (Model Form A-9). To that end, there are two methods that financial institutions can use to determine when an account's balance dips below zero (and thus is chargeable with an overdraft fee): (1) the "actual balance"[2] method or (2) the "available balance" method. The "actual balance" is the amount of money in an accountholder's account at any particular time and considers only settled transactions. *See* Consumer Fin. Prot. Bureau, Supervisory Highlights 8 (Winter 2015),

---

[1] Congress reassigned enforcement of the EFTA from the Federal Reserve Board to the Consumer Financial Protection Bureau ("CFPB") in 2010. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title X, § 1084, 124 Stat. 1376, 2081–83.
[2] This method is also referred to commonly by other courts as the "ledger balance" or "current balance."

*available at* https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf (last visited February 4, 2026). In contrast, the "available balance" is the amount of money in the account minus any "holds" or pending debits that have not yet posted—i.e., not settled transaction. *Id*. Accordingly, calculating overdrafts based on the available balance "often leads to more frequent overdrafts because there is less money available in the account." *Domann v. Summit Credit Union*, 2018 WL 4374076 (W.D. Wis. Sept. 13, 2018) (citation omitted). These two competing methods of calculating a consumer's balance lie at the heart of this case.

Regulation E does not dictate which method financial institutions ought to use; only that they disclose it accurately, clearly, and in an understandable way. 12 C.F.R. § 1005.17(b)(1)(i). Here, CUA concedes it uses the available balance method. (Doc. 14 at 7.) Plaintiff alleges that CUA's use of the one-page notice entitled "What You Need to Know about Overdrafts and Overdraft Fees" (the "Opt-in Notice") does not explain how it assesses overdraft fees. (Docs. 1 ¶¶ 39–41; *see also* 1-1.)[3] Mirrored nearly verbatim from Model Form A-9, CUA's Opt-in Notice states that an overdraft "occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Compare* 12 C.F.R. § pt. 1005, app. A, *with* Doc. 1-1. Plaintiff alleges that CUA has violated, and continues to violate, Regulation E because the phrase "enough money" does not clearly indicate whether CUA utilizes the actual or available balance calculation methods. (Doc. 1 ¶¶ 44, 68.) In other words, Plaintiff argues that the Opt-in Notice fails to provide a "clear and readily understandable" explanation of "[CUA's] overdraft service," which renders affirmative consent practically impossible. *See* 12 C.F.R. §§ 1005.4(1)(1), 1005.17(b)(1)(i).

---

[3] In deciding a Rule 12(b)(6) motion, the court ordinarily considers only the allegations of the complaint, although the court may also consider documents attached to the complaint or documents referred to in the complaint if they are central to the plaintiff's claims and the parties do not dispute their authenticity. *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020). Here, CUA's Opt-in Notice is attached as an exhibit to the complaint (Doc. 1-1), is central to Plaintiff's claim, and its authenticity is not in dispute. Accordingly, the court will consider it.

Plaintiff continues by alleging that because CUA's Opt-in Notice did not comply with Regulation E or the EFTA, Plaintiff was unable to consent to CUA's overdraft program and was harmed. (Doc. 1 ¶ 49.) Specifically, CUA charged Plaintiff overdraft fees on multiple occasions, including a $28 overdraft fee on one-time card and ATM transactions on May 21, 2024, May 23, 2024, and May 30, 2024. (*Id*. ¶¶ 47–48.)

Plaintiff brought this case as a consumer class action. Plaintiff's proposed class includes the following individuals:

> All consumers who, during the applicable statute of limitations, were checking accountholders of [CUA] and were assessed an overdraft fee on a one-time debit card or ATM transaction.

(*Id*. ¶¶ 50–61.) Plaintiff asserts one claim, that CUA failed to accurately describe its overdraft service in violation of Regulation E and the EFTA. (*Id*. ¶¶ 62–76.) Specifically, that CUA failed to provide her and others similarly situated, with a clear and understandable description of how CUA's overdraft fees were assessed, whether using the actual or available method. Plaintiff seeks actual damages, restitution, and attorneys' fees for Plaintiff and the proposed class. CUA now moves to dismiss. (Docs. 13, 14.)

**II.     Standard**

CUA moves to dismiss on the basis that Plaintiff failed to state a claim. The court will grant a Rule 12(b)(6) motion to dismiss only when the factual allegations fail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face and not just conceivable. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Twombly*, 550 U.S. at 555); *see also In re Motor Fuel*

4

*Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1216 (D. Kan. 2008). All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiff. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). The court construes any reasonable inferences from these facts in favor of the nonmoving party. *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006). Conclusory allegations, however, have no bearing upon the court's consideration. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

**III.   Analysis**

CUA presents three arguments. First, that CUA did not violate Regulation E because the "Terms and Conditions of Your Account" disclosure (the "Membership Agreement")—which requires a member's assent to open an account with CUA—makes clear that CUA calculates overdraft charges using the available balance method. (Doc. 14 at 8–11.) Second, that CUA did not violate Regulation E because the Opt-in Notice's reference to "enough money" gives sufficient notice that CUA calculates overdraft charges using the available balance method. (*Id*. at 11–12.) Third, that the EFTA's safe harbor provision insulates CUA from liability under 15 U.S.C. § 1693m(d)(2). (*Id*. at 12–15.) The court will consider each argument in turn.

**A.   The Membership Agreement**

Before addressing the merits of CUA's Regulation E argument, the court must first determine whether it may even consider the Membership Agreement at this stage of the litigation. The court holds it cannot.

CUA points to principles in contract law and argues that its Opt-in Notice ought to be construed together with the Membership Agreement because both documents concern the same subject matter. (Doc. 14 at 11.) CUA goes on to explain that even if its Opt-in Notice was ambiguous or unclear, that the Membership Agreement clearly explains CUA's overdraft policy.

In response, Plaintiff argues that Regulation E requires a "standalone document" and that courts consistently have recognized they must consider the overdraft opt-in notice in isolation, and not with "extraneous" disclosures such as CUA's Membership Agreement. (Doc. 16 at 10–11.) The court agrees with Plaintiff.

Regulation E requires financial institutions to provide disclosures about their overdraft policies to customers with "a notice in writing . . . segregated from all other information." 12 C.F.R. § 1005.17(b)(1)(i). In other words, a standalone document is required. Here, the Opt-in Notice is that standalone document; thus, all relevant information about CUA's overdraft policy must be in the Opt-in Notice. Therefore, information found in other documents provided by CUA are "irrelevant to whether . . . the segregated document[] adequately explains [CUA's] overdraft policy." *Grenier v. Granite State Credit Union*, 2021 WL 5177709, at *3 (D.N.H. Nov. 8, 2021). Here, the Membership Agreement is merely extraneous information, wholly irrelevant to answering the question of whether the Opt-in Notice adequately communicates CUA's overdraft policy. *See Adams v. Liberty Bank*, 2021 WL 3726007, at *4 (D. Conn. Aug. 23, 2021) (refusing to consider extraneous documents on Rule 12(b)(6) motion because Regulation E requires the opt-in notice to be "segregated from all other information"); *Miller v. Del-One Fed. Credit Union*, 2022 WL 2817875, at *1 (D. Del. July 19, 2022) (Bibas, J., sitting by designation) (same).

Moreover, the Membership Agreement is not mentioned in, or attached to, Plaintiff's complaint. On that basis, the court cannot consider it. *Comapre Miller*, 2022 WL 2817875 at *1 (declining to consider extraneous account agreement because it was "not even mention[ed]" in the complaint); *with Rader v. Sandia Lab'y Fed. Credit Union*, No. CV 20-559 JAP/JHR, 2021 WL 1533664, at *2 n.3 (D.N.M. Apr. 19, 2021) (considering the membership agreement because the plaintiff "attached copies . . . to her Complaint."). Thus, whether the Membership Agreement

6

articulates CUA's overdraft policy in a "clear and readily understandable manner" is not the question before the court; rather, the question is whether the Opt-in Notice does. 12 C.F.R. § 1005.17(b)(1)(i). Finally, CUA cites a list of cases where the court looked to the language of an additional agreement. (Doc. 14 at 11–12.) But they are distinguishable. In those cases, the plaintiff brought state law contract claims along with a claim under Regulation E. In contrast here, Plaintiff has brought a single claim under Regulation E. (Doc. 1 ¶¶ 62-76.) Accordingly, the court will look only to the Opt-in Notice to determine whether the Opt-in Notice complied with the law.

### B. Violation of Regulation E

CUA's Opt-in Notice is practically identical to Model Form A-9. *Compare* Doc. 1-1, *with* 12 C.F.R. pt. 1005, app. A. The Opt-in Notice states: "An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." (Doc. 1-1 (emphasis in original).) The parties dispute whether the Opt-in Notice accurately describes CUA's overdraft policy. (Docs. 14 at 14–15; 16 at 10–13.) Plaintiff reads this definition as not clearly identifying whether CUA uses the available or actual balance methods in determining when to charge an overdraft fee. (Doc. 1 ¶¶ 28–29.) This confusion is warranted. Plaintiff could incur an overdraft fee when her account shows it contains sufficient funds to cover the transaction. (Doc. 16 at 10.) As one court opined, the "[o]rdinary consumers would likely understand the phrase 'do not have enough money in your account' to refer to a literal shortfall of cash, not the possibility of one." *Miller*, 2022 WL 2817875 at *2. In any event, Plaintiff's confusion triggered by the phrase "enough money" is no doubt plausible. Which is all that is required at this stage.

In response, CUA argues that Plaintiff's assertion that the phrase "enough money" could plausibly refer to the actual balance calculation method is contradicted by the fact that the Federal Reserve has always recognized that financial institutions typically impose overdraft fees on the

7

customer's available balance. (Doc. 14 at 11.) This argument is unpersuasive. The Federal Reserve's purported knowledge or expectations regarding financial institutions' "common" practices have no relevance to whether CUA's overdraft fee disclosures complied with federal law. *See Wodja v. Washington State Emps. Credit Union*, 2016 WL 3218832, at *3 (W.D. Wash. June 9, 2016) (rejecting the financial institution's argument that because terms have "an established, well-known meaning in the financial services industry," customers ought to be tasked with knowledge of those terms).

Next, CUA argues that it used nearly identical language to Model Form A-9. Thus, if the court accepts Plaintiff's position, it will render Model Form A-9 to be "a defective product" that is of no use to financial institutions. (Doc. 14 at 15.) This is not so. First, a model, by its nature, is a template or format that then must be tailored to a particular policy. The distinction between "actual" and "available" balance methods for calculating overdrafts provides a good and relevant example, as those methods bring about potentially significant differences for consumers—differences that must be clearly explained when adapting a model form. *See Miller*, 2022 WL 2817875 at *1 ("A good template serves as a guide, not gospel. It must be adapted"). But more fundamentally, whether a model form is useful to a financial institution or not is irrelevant to whether that institution has complied with Regulation E and the EFTA. More appropriately, what Regulation E and the EFTA commands is that financial institutions provide a "clear and readily understandable" notice involving its overdraft services. 12 C.F.R. § 1005.4(a)(1); 15 U.S.C. § 1693c(a). Viewed in that light, the language in the Opt-in Notice could plausibly mean the account balance based on only transactions that have settled, or the account balance determined by subtracting pending transactions that have not yet settled (actual v. available balance). *See Jones v. Bankers Tr. Co.*, 748 F. Supp. 3d 692, 707–08 (S.D. Iowa 2024); *Grenier*, 570 F. Supp. 3d at

23; *Adams*, 2021 WL 3726007, at *1. This ambiguity on the face of the Opt-in Notice establishes that it is inadequate under Regulation E because it is not "clear and readily understandable." *See Tims*, 935 F.3d at 1243–44 (quoting 12 C.F.R. § 1005.4(a)(1)). Accordingly, whether Model Form A-9 is useful or defective is irrelevant to the issues before the court.

In sum, Plaintiff has plausibly stated a claim that the phrase "enough money" is ambiguous and does not provide a "clear and readily understandable" explanation of CUA's overdraft service. 12 C.F.R. § 1005.4(1)(1); 1005.17(b)(1)(i). Accordingly, Plaintiff's claim may proceed.

### C. Regulation E's Safe Harbor

Finally, CUA argues that even if Model Form A-9 is ambiguous, it is shielded from liability by the EFTA's safe harbor provision, which provides no liability shall be imposed for "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the" CFPB. (Doc. 14 at 12–15 (citing 15 U.S.C. § 1693m(d)(2)).) CUA points to Regulation E's mandate that their Opt-in Notice be "substantially similar" to Model Form A-9, and that the Opt-in Notice "may not contain any information not specified in or otherwise permitted by this paragraph." (*Id.* (citing 12 C.F.R. § 1005.17(d)).) At bottom, CUA states that because they used Model Form A-9 as a template for their Opt-in Notice, it cannot be liable. The court disagrees and therefore declines to extend the safe harbor's protection to CUA.

Title 15 U.S.C. § 1693m(d) provides the safe harbor. "[T]he starting point in any case involving the meaning of a statute, is the language of the statute itself." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there."). Additionally, "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word

shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotations omitted). Plaintiff would have this court look solely at the interpretations of nonbinding courts' decisions to ascertain the text's meaning. (Doc. 16 at 17.) This the court cannot do. Consistent with these directives, the court begins where it must, with the statutory text itself. The applicable section of the EFTA provides that no liability shall apply to "any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or Board." 15 U.S.C. § 1693m(d).

Plaintiff argues that the safe harbor provision protects institutions from liability arising from the form of the notice they provide but not its substance. (Doc. 16 at 13.) The court agrees. The best starting point is the definitions for these two terms. The court will then look to Plaintiff's complaint and determine whether she challenges the form or substance of the Opt-in Notice. According to Black's Law Dictionary, "form" refers to "[t]he outer shape, structure, or configuration of something, as distinguished from its substance or matter," *Form*, Black's Law Dictionary (12th ed. 2024), while "substance" refers to "[t]he essence of something; the essential quality of something, as opposed to its mere form," *Substance*, Black's Law Dictionary (12th ed. 2024). Similarly, the Oxford English Dictionary defines "form" as primarily something's shape or configuration, while "substance" is the essential nature of something. *See Form*, Oxford English Dictionary (3d ed. 2026); *Substance*, Oxford English Dictionary (3d ed. 2026). Here, Plaintiff alleges that the language in the Opt-in Notice failed to accurately describe CUA's overdraft service—which challenges its substance, not its form. (Doc. 1 ¶ 68.) On the other hand, examples of when Regulation E's safe harbor would shield a financial institution from a challenge to their notice's form include when the financial institution failed to: (1) provide a consumer with a reasonable opportunity to consent on an overdraft policy; (2) provide the overdraft opt-in notice

10

in writing; or (3) segregate the overdraft opt-in notice from all other documents. *Miller*, 2022 WL 2817875 at *2–3 (citing 12 C.F.R. § 1005.17(b)(1)(i)–(ii)). Plaintiff's claim in the instant matter does not allege violations concerning those matters. Rather, she challenges whether the Opt-in Notice accurately describes CUA's overdraft policy as using the actual or available balance calculation method—an inquiry into the notice's substance.

Moreover, removing the phrase "in proper form" from the statute would fundamentally alter its meaning and scope. The Supreme Court has long recognized that Congress "says in a statute what it means and means in a statute what it says there." *BedRoc Ltd.*, 541 U.S. at 183. Had Congress intended to provide blanket immunity to financial institutions for use of model language, it need not have included the limiting phrase "in proper form." 15 U.S.C. § 1693m(d)(2). A reading of the statute without that phrase would have created precisely the broad safe harbor CUA advocates for—absolute protection from liability whenever Model Form A-9 is used. This reading cannot be reconciled with the presumption that every word in a statute be given effect. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous"). Instead, Congress specified that, as relevant here, failures "to make disclosure in proper form" triggered the safe harbor's application. Congress made a deliberate choice in crafting the safe harbor language, and courts must respect that choice.[4]

---

[4] The court notes that numerous federal courts have reached identical conclusions when confronted with this precise language. *See, e.g., Miller*, 2022 WL 2817875 at *2; *Tims*, 935 F.3d at 1238; *Monroe v. Anderson Bros. Bank*, 2025 WL 3470728, at *4 (D.S.C. Dec. 3, 2025); *Brusati v. Montana Fed. Credit Union*, 2025 WL 3205014, at *1 (D. Mont. Nov. 17, 2025); *Ray v. Atl. Union Bank*, 791 F. Supp. 3d 655, 660 (E.D. Va. 2025); *Wellington v. Empower Fed. Credit Union*, 533 F. Supp. 3d 64, 71 (N.D.N.Y. 2021); *Grenier*, 570 F. Supp. 3d at 21; *Adams*, 2021 WL 3726007 at *7; *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 265 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 856–67 (W.D. Mich. 2016); *Gunter v. United Fed. Credit Union*, 2017 WL 4274196 at *3 (D. Nev. Sept. 25, 2017). As stated by one court, "[i]f use of a model clause were, by itself, an impenetrable shield, a consumer would have no redress" when Model Form A-9 does not actually provide a "clear and readily understandable" description of an institution's overdraft services. *Adams*, 2021 WL 3726007, at *7.

CUA points out two district court opinions from this circuit that are worth addressing. *See Tilley v. Mountain Am. Fed. Credit Union*, 2018 WL 4600655, at *4–*6 (D. Utah Sept. 25, 2018); *Rader*, 2021 WL 1533664 at *13–*14. These cases held that the financial institution's use of an opt-in form "almost identical to Model Form A-9" was sufficient to insulate them from Regulation E liability. *Tilley*, 2018 WL 4600655 at *4; *see also Rader*, 2021 WL 1533664 at *13. CUA alleges their Opt-in Notice models the notices in those cases and therefore demands a similar holding. (Doc. 14 at 15.) Respectfully, the court disagrees with the reasoning in those cases. In *Tilley*, the court cited a Northern District of Georgia case for the proposition that because the phrase "enough money" from Model Form A-9 can plausibly mean that a financial institution calculates overdrafts based on the available balance method, that it does not run afoul of Regulation E. *Tilley*, 2018 WL 4600655, at *5. First, the Eleventh Circuit has reversed that Northern District of Georgia case, holding that using language from Model Form A-9 "does not shield [a financial institution] for claims based on their failure to make adequate disclosures." *Tims*, 935 F.3d at 1243. Second, this court has already discussed the two possible definitions for the phrase "enough money," and how that ambiguity in and of itself renders the phrase not "clear and readily understandable." 12 C.F.R. § 1005.17(b)(1)(i). As for *Rader*, that decision relied almost exclusively on *Tilley's* reasoning regarding the safe harbor analysis. *See* 2021 WL 1533664, at *13-*14. Accordingly, neither *Tilley* nor *Rader* provides persuasive authority for CUA's position.

In conclusion, the court, after viewing the allegations in the complaint as true, finds that Plaintiff has plausibly stated a claim that CUA's Opt-in Notice violated Regulation E. Moreover, the safe harbor provision in the EFTA is not applicable to Plaintiff's claim. Congress's deliberate inclusion of the phrase "in proper form" demonstrates its intent to distinguish between formal and substantive compliance. Therefore, CUA is not shielded from Plaintiff's regulatory claim.

**IV.   Conclusion**

THEREFORE, Defendants' motion to dismiss (Doc. 13) is DENIED.

IT IS SO ORDERED.  Dated this 9th day of February, 2026.

                                                __s/ John W. Broomes__
                                                JOHN W. BROOMES
                                                CHIEF UNITED STATES DISTRICT JUDGE